Laurence G. O'CONNOR

v.

Harry F. McKANNA, Jr., et al., Members
of the School Committee of the Town
of West Warwick.

No. 78-71-Appeal.

Supreme Court of Rhode Island.

Feb. 25, 1981.

Robert R. Afflick, West Warwick, William A. Gosz, Providence, for plaintiff.

Edwin H. Hastings, Providence, for defendants.

## OPINION

KELLEHER, Justice.

The plaintiff, Laurence G. O'Connor, is a former superintendent of the town of West Warwick's schools. In this Superior Court civil action he seeks damages from the defendants individually and also as members of the town's school committee because of an alleged breach of an employment contract executed on May 25, 1971. As will be seen, this litigation has had a yo-yo existence within our judicial system since suit was first begun in February of 1974. The plaintiff is now before us on an appeal from a judgment entered in the Superior Court, after a jury-waived trial, denying and dismissing his complaint. Hereinafter we shall refer to the plaintiff as O'Connor and the defendants, where appropriate, as the committee.

Early in 1971 the then superintendent of schools notified the committee of his intention to retire at the end of the school year.

The committee at that time was composed of three individuals; Armand M. Archambault was its chairman, and his associates were John J. Keenan and Josephine A. Barber. The committee appointed a search committee, which advertised the vacancy in such publications as The New York Times and in due course received approximately sixty applications. The search committee then presented to the school committee the names of three candidates. O'Connor was one of the finalists. When the other two finalists withdrew their applications, O'Connor and the school committee entered into certain negotiations which culminated in the execution of the contract that is now before us.

The contract, which was signed on May 25, 1971, called for a two-year term beginning on July 1 of that year. O'Connor was to receive an annual salary of $21,000 plus other fringe benefits. The contract contained a renewal clause that reads as follows:

"That failure to notify the Superintendent in writing no later than sixty (60) days of the contract of the Board's intent not to renew the contract will automatically result in an extension of the existing contract."

O'Connor began his superintendency on July 1, 1971.

Time marched on, and on February 27, 1973, the committee notified O'Connor in writing that his employment would be terminated as of the following June 30. O'Connor responded to this notice with a letter of March 14, 1973, in which he asked the committee for a "total payoff for my services in this school district as of the end of March" and also pointed out, "This request is based upon thirty days of sick leave and two months of vacation not taken."

When the committee assembled for its regular meeting on March 27, O'Connor stated that he desired to put his March 14 epistle in proper context. He then told the committee, "I am requesting a total payoff. A payoff for two years and three months. So I want to enter in the minutes that this is a total payoff that I will contend is mine." The committee then adopted a resolution authorizing a total payoff in accordance with O'Connor's letter and terminated his services as of that day.

This litigation began about a year later, in February 1974. In his complaint O'Connor complained that since the committee had failed to notify him of its intention not to renew the contract within sixty days of its execution, the contract had been extended for an additional two-year period. In addition to the three months' salary due for the remainder of the 1972–73 term, he was also seeking the salary that would have been payable for the years 1973–74 and 1974–75. The committee in its answer denied that it had ever breached the contract. Subsequently, it filed a motion for summary judgment, charging that O'Connor's claim that the notice of an intent not to renew had to be given within sixty days of the execution of the contract was so inherently unreasonable that the court could as a matter of law rule in the committee's favor.

Affidavits of the committee members who were present at the precontract negotiations were offered in support of the motion. However, O'Connor filed a counteraffidavit, in which he described the notice-of-termination provision as a compromise between his insistence that he needed at least four years to put the school system in shape and the committee's desire to have an opportunity in which they could evaluate his performance.

The trial justice granted the committee's motion, but this court reversed, pointing out that in light of O'Connor's affidavit the contract was ambiguous in regard to the intent of the parties and presented a disputed question of material fact. Consequently, we remanded the case to the Superior Court for an evidentiary hearing. *O'Connor v. McKanna*, 116 R.I. 627, 359 A.2d 350 (1976).

On September 2, 1977, another trial justice, in a far ranging and discursive written opinion, denied and dismissed O'Connor's complaint. The dismissal was based on a variety of reasons, but at no time did the trial justice discuss the so-called renewal clause. An appeal ensued, briefs were filed,

and oral arguments were heard. Thereafter, we remanded the case to the Superior Court with a direction that the trial justice make findings about what the parties intended when they included an ambiguous renewal clause. *O'Connor v. McKanna,* R.I., 419 A.2d 315 (1980). Subsequently, on October 6, 1980, the trial justice in a written opinion addressed the issue and rejected O'Connor's claim that the sixty-day stipulation established a probationary period that began with the execution of the contract on May 25, 1971, and expired two months later on July 25. Following receipt of this decision we once again heard the parties concerning the validity of the trial justice's additional findings.

▮ Much of the evidence presented to the trial justice was contradictory. However, there was no dispute that the contract was drawn up by O'Connor based upon two sample contracts that he provided at the committee's request. Interestingly enough, these two samples had been prepared by professional associations representing in one case the interests of school administrators and, in the other, those of school superintendents. Both samples[1] contained automatic extension clauses that were geared to the termination date of the contract rather than to the date of its execution.

In his direct testimony, O'Connor insisted that when he negotiated with the committee in the spring of 1971, he was seeking a contract that would assure him of employment for at least five years but that in the spirit of compromise, he agreed to a four-term. He also insisted that the modification of the sample extension clause "was dictated to me by Maurice from the documents and his own notes." Maurice was the committee's chairman, Armand M. Archambault. He was suffering from a terminal illness which caused him to resign from the committee long before O'Connor brought suit. In his direct examination, O'Connor also explained that Keenan was

reluctant to be committed to anything beyond a two-year term because of his concern that his constituency would react adversely to the inclusion of a greater term. He also stated that Archambault had told him that the modified renewal clause would give the new superintendent a four-year term as well as assuage Keenan's concern about the taxpayers' reaction if the proviso had in clear and explicit language guaranteed a four-year term to an office whose prior occupants were assured of no more than two years' service.

The remaining members of the committee, Josephine Barber and John Keenan, both testified at trial and stated unequivocally that the committee had never agreed to anything beyond a two-year contract and had never discussed a four-year contract. Keenan said he was aware that O'Connor had said that it would take longer than two years to do the job, but "I said we could not go along with more than a two year contract."

The trial justice rejected O'Connor's testimony on credibility grounds. He described O'Connor's attempt, at the March 27, 1971 committee meeting, to clarify his earlier March 13 request for a total payoff as "an afterthought." In doing this, the trial justice referred to O'Connor's cross-examination where he was confronted with his answers to interrogatories propounded by the committee. In his responses O'Connor had described Keenan, rather than Archambault, as the force behind the modified clause and as the individual who had taken pen in hand and changed the sample. O'Connor also conceded in redirect examination that he was aware that the renewal clause as drafted provided for an extension of employment for an indeterminate time but felt he had no responsibility to bring it to the committee's attention. Again, O'Connor testified that his West Warwick salary had risen at the end of the first year

1. The form contract prepared by the American Association of School Administrators contains the following extension clause:
   "That failure to notify the Superintendent in writing, no later than one full year prior to the termination of the contract, of the Board's intent not to renew the contract will automatically result in a one-year extension of the existing contract."

from $21,000 to $25,000, inferentially indicating approval of his performance. In actual fact, his raise was an automatic one from $21,000 to $21,500, a fact substantiated by Keenan's testimony and records of the school department. O'Connor was also insistent that he would not have accepted the West Warwick contract had it been unsatisfactory to him but instead would have remained in Coventry, Connecticut, as its school superintendent. In a letter, which he himself produced at trial, dated June 12, 1970, almost a year before the West Warwick contract was executed, his two-year Coventry contract was extended by one additional year to June 30, 1971; and the Coventry school authorities indicated that the extension would permit O'Connor to assist the board "in interviewing and screening candidates for the superintendency."

The trial justice, after consideration of all the evidence, ruled that it was clear to him that when the parties entered into the employment contract, they intended that the new superintendent was to be given a two-year contract that would be renewed for an additional two-year term unless the committee within sixty days prior to July 1, 1973, gave O'Connor notice that his services would no longer be required. In taking this position, the trial justice specifically pointed to O'Connor's March 13, 1971 payoff letter as proof positive of O'Connor's intent. The trial justice also emphasized that, in his opinion, O'Connor was seeking to take advantage of Archambault's death, and his testimony concerning the four-year contract was not worthy of belief. We see no reason to disagree with this conclusion.

As we noted when O'Connor first appeared before us on his appeal from the grant of the committee's motion for summary judgment, the present controversy revolves around an ambiguous portion of an employment contract. This ambiguity presented a question of fact. The trial justice's findings of fact are entitled to great weight and will be disturbed by this court on appeal only if the party can demonstrate that such findings are clearly wrong or that the trial justice misconceived or overlooked material evidence. *Bottomley v. Coffin*, R.I., 399 A.2d 485 (1979). We have examined the record with care and find that the conclusions expressed by the trial justice are amply justified.

The plaintiff's appeal is denied and dismissed, and the judgment appealed from is affirmed.

BEVILACQUA, C. J., did not participate.